UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RHONDA R. FITZGERALD, an individual, and on behalf of all persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MARCUS POLLARD, an individual; Lieutenant C. MOORE, an individual; Sergeant H. CRUZ, an individual; Officer JACKSON, an individual; Officer LITTLE, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.:  20cv848 JM(NLS)<br><br>**ORDER ON MOTION TO DISMISS** |

Presently before the court, is a motion to dismiss pursuant to Federal Rules of Civil 12(b)(6) filed by Defendants M. Pollard, A. Jackson, C. Mann-Little, H. Cruz, and C. Moore, (collectively "Defendants").  (Doc. No. 8.)  The motion has been fully briefed and the court finds it suitable for submission on the papers and without oral argument in accordance with Civil Local Rule 7.1(d)(1).  For the reasons set forth below, the motion is denied.

1

## I.    Background

On May 5, 2020, Plaintiff filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging that Defendants violated her civil rights and committed torts against her.  (Doc. No. 1, "Compl.".)  Plaintiff asserts: (1) her first claim for violation of her Fourth Amendment right - search without reasonable suspicion against all Defendants; (2) her second claim for violation of her Fourth Amendment right – search without reasonable suspicion against Defendant Pollard and Doe 1; and (3) her third claim for violation of the Fourth Amendment – failure to train and supervise, against Defendant Pollard and Doe 1.  (*Id*. at 8-16.)  Plaintiff's fourth and fifth claims, intentional infliction of emotional distress and negligence, are brought against all Defendants.  (*Id.* at 16-19.[1])

Plaintiff seeks to represent a Class consisting of:

> those visitors to the Richard J. Donovan Correctional Facility in the Class Period[2] who were required to submit to an unclothed search as a condition to visiting an inmate and whose Notice of Request for Search Form states no specific objective facts and rational inferences establishing individualized reasonable suspicion to believe that the person targeted for the search had an intention of smuggling contraband into the Prison.

*Id.*  ¶ 38.

Plaintiff seeks injunctive relief barring Defendants from performing further random unclothed searches of visitors at the prison, money damages, and attorney's fees and costs. (*Id.* at 20-21.)

On July 10, 2020, Defendants filed a motion seeking to dismiss the complaint in its entirety under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. No. 8.)  Plaintiff filed her opposition to the motion on August 11, 2020, (Doc. No. 13), and Defendants filed

---

[1] Document numbers and page references are to those assigned by CM/ECF for the docket entry.

[2] The Complaint defines the Class Period as running "from two years prior to the filing date of this action to the present date."  Compl. ¶ 37.

a reply, (Doc. No. 14).  At the request of Defendants, the parties were given the opportunity to file supplemental briefing addressing recent Ninth Circuit case law regarding qualified immunity in the context of searches of prison visitors.  (Doc. Nos. 16-19.)

## II.   Allegations of the Complaint

On September 28, 2019, Plaintiff visited the Richard J. Donovan Correctional Facility ("Prison") located at 480 Alta Road, San Diego, California, 92179, to see her friend, inmate Christopher Roberts.  (Compl. ¶¶ 2, 13.)

Plaintiff was neither screened nor searched upon arrival at the visitor reception area.  (*Id.* ¶ 14.)  Plaintiff waited in line, and when she reached the front desk, she was told by Officer Little that she must submit to an unclothed search or that she would not be permitted to visit Roberts.  (*Id.* ¶¶ 15, 16.)  When questioned as to why the search was being performed, Little responded "that the search was random and that Warden Pollard requested it."  (*Id.* ¶ 17.)

Little did not offer to perform the search via less intrusive means, such as a metal detector, hand-held wand, electronic drug detector, ION scanner, canine search, or clothed body search.  (*Id.* ¶ 18.)  No-one at the Prison explained to Plaintiff what an unclothed search entailed.  Plaintiff:

> assumed the search would require removing her top and pants and being patted down to search for guns and contraband.  Nowhere on the form did it state that the search would include invasive measure such as removing all clothes, including undergarments, and requiring her to spread her butt cheeks and cough multiple times while a guard visually inspected her "private parts."

*Id.* ¶ 19.

Having driven 165 miles to see Roberts, Plaintiff acquiesced to the search "that she understood to be non-intrusive."  (*Id.* ¶ 21.)  Little produced a Notice of Request for Search Form (the "Request to Search Form" or the "Form").  Plaintiff signed the Form, but neither Little nor any of his supervisors signed the Notice in advance of the search.  (*Id.* ¶¶ 22, 23.)

Officer Jackson was summoned by Little from the visitor area in Yard E. (*Id.* ¶ 24.) Little grabbed a container, and she and Jackson led Plaintiff into a small room. (*Id.* ¶ 25.) Plaintiff was instructed by Little to turn around, face the wall, and remove each item of clothing. (*Id.*) As Plaintiff removed each item of clothing, Little patted the item down and placed it in the container. (*Id.*) Jackson stood by the door and "looked uncomfortable." (*Id.*)

When Little requested that Plaintiff remove her underwear, Plaintiff asked what was going on. (*Id.* ¶¶ 26-27.) Little responded that everything had to be removed so that a body-cavity search could be performed. (*Id.* ¶ 27.) Little instructed Plaintiff to bend over, spread her butt cheeks, and cough. (*Id.*) Little also told Plaintiff to lift her breasts. (*Id.*) Little found nothing. (*Id.*) Jackson apologized. (*Id.* ¶ 28.)

Little refused to give Plaintiff a copy of the Request to Search Form, even though the "gold copy" of the Request to Search Form is supposed to be given to the visitor. (*Id.* ¶ 29.)

After being subjected to the strip search, Plaintiff found out that another visitor had also undergone a strip search before she was permitted to visit an inmate and that such searches were "common practice." (*Id.* ¶ 31.)

No one at the Prison explained why such an intrusive search of Plaintiff was necessary. (*Id.* ¶ 28.) Weeks later, Plaintiff was given a copy of the Request to Search Form by Defendant Cruz, who signed the Form in front of her. (*Id.* ¶ 33.) Plaintiff believes that Defendant Moore previously signed the Request to Search Form. (*Id.*)

In support of her allegations, Plaintiff points to California Code of Regulations, title 15. Section 3173.2, which regulates searches of Prison visitors. (*Id.* ¶¶ 34-36.)

### III.   Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may bring a motion to dismiss based on the failure to state a claim upon which relief may be granted. A Rule 12(b)(6) motion challenges the sufficiency of a complaint as failing to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S.

544, 570 (2007).  Ordinarily, for purposes of ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the non-moving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d 1025, 1031 (9th Cir. 2008).   But, even under the liberal pleading standard of Rule 8(a)(2), which requires only that a party make "a short and plain statement of the claim showing that the pleader is entitled to relief," a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 555). "Determining whether a complaint states a plausible claim for relief … [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## IV.   Discussion

The Defendants make four arguments for dismissal.  First, they argue that since Plaintiff consented to the search, her Fourth Amendment claim must fail.  (Doc. No. 8 at 13-19.)  Defendants' second argument concerns the applicability of the qualified immunity doctrine to Plaintiff's Fourth Amendment Due Process Claims, with Defendants asserting the claims are barred by their qualified immunity from civil damages liability.  (*Id.* at 19- 21.)  Third, Defendant Pollard argues that the absence of an underlying constitutional violation necessitates the dismissal of the failure to train claim.  (*Id.* at 21-22.)  Fourth, all Defendants move to dismiss the pendant state law claims.  (*Id.* at 22.)

### A. Fourth Amendment Search Conducted Without Reasonable Suspicion Claims Against Defendants and the Qualified Immunity Doctrine

Defendants seek dismissal of Plaintiff's §1983 claims under the qualified immunity doctrine, asserting Plaintiff has failed to allege any misconduct on their part, related to Plaintiff's strip search, that violated Plaintiff's clearly established rights under the Fourth Amendment.

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S.

5

266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).   To successfully plead a claim under 42 U.S.C. § 1983, a plaintiff must allege that the defendant, while acting under color of state law, deprived the plaintiff of a right or privilege conferred by the Constitution of the United States.  *See Nelson v. Campbell*, 541 U.S. 637, 643 (2004) (citing 42 U.S.C. § 1983); *Jones v. Williams*, 297 F.3d 930, 930 (9th Cir. 2002). "The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker*, 443 U.S. at 140.

"[G]enerally, a public employee acts under color of state law while engaged in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 49-50 (1988).  An individual deprives a plaintiff "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  As defendant's section 1983 liability can be "established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor reasonably should know would cause others to inflict the constitutional injury." *Id.* at 743-44.

### 1. Constitutional Violation

The Fourth Amendment protects the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV.  "The reasonableness of a search is determined by reference to its context." *Bull v. City & Cnty. of S.F.*, 595 F.3d 964, 971 (9th Cir. Feb. 9, 2010) (citing *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir.1988)).  "To determine whether a particular search is unreasonable, the intrusion on the individual's privacy interests must be balanced against 'its promotion of legitimate governmental interests.'" *Cates v. Stroud*, 976 F.3d 972, 979 (9th Cir. 2020) (quoting *Del. v. Prouse*, 440 U.S. 648, 654 (1979)).

Because Plaintiff was subject to a search, the purpose of which was to remove contraband or unauthorized substances from a prison, it necessarily furthers the

institutional security goals within a detention facility and thus implicates the principles articulated in *Bell v. Wolfish*, 441 U.S. 520 (1979).[3]  In *Bell*, the Supreme Court explained that detainees and inmates "retain some Fourth Amendment rights upon commitment to a corrections facility" and noted that "[t]he Fourth Amendment prohibits only unreasonable searches."  *Id*. at 558.  The "test of reasonableness ... requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  *Id.* at 559. Although the Court acknowledged that the strip search was invasive, *id*. at 558 n. 9, it nonetheless concluded that the strip search policy at the corrections facility was reasonable in light of the institution's needs and objectives, particularly the cited security concerns. *Id.* at 558-59.  Thus, the Court held that a mandatory, routine strip search policy applied to prisoners "after every contact visit with a person from outside the institution," without individualized suspicion, was facially constitutional.  *Id*. at 558.

Until recently, the Ninth Circuit had not addressed in a published opinion, what if any protections under the Fourth Amendment are afforded to prison visitors regarding strip searches. [4]  Courts of Appeals in numerous other circuits, however, have concluded, in the

---

[3] In *Bell, t*he Supreme Court upheld the detention facility's policy of conducting mandatory visual body cavity searches, including the requirement that detainees undergo such an inspection as part of a strip search "after every contact visit with a person from outside the institution," against Fourth and Fifth Amendment challenges.  Several principles informed the Court's analysis including that: (1) pretrial detainees and prisoners do not forfeit all constitutional protections by virtue of incarceration, 441 U.S. at 545; (2) the retained constitutional rights of prisoners and detainees alike were subject to restrictions and limitations based on "institutional needs and objectives," *id* at 546; and (3) restrictions that infringe upon "a specific constitutional guarantee" must be "evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id*. at 547.

[4] Although it had addressed strip searches being performed on detainees.  *See, e.g., Fuller v. M.G. Jewelry*, 950 F.2d 1437 (9th Cir. 1991).

prison visitation context, that "after weighing the state's legitimate interest in prison security against the privacy rights of prison visitors, a visitor may only be [strip searched when justified] by reasonable suspicion." *O'Con v. Katvich*, No. 1:13-cv-1321-AWI-SKO, 2013 WL 6185212, at *5 (E.D. Cal. Nov. 26, 2013) (collecting cases).

Notably, in the detainee context, the Ninth Circuit has made clear that a visual body cavity search cannot be justified based on a blanket strip search policy alone.  In *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1446 (9th Cir. 1991), the court wrote: "the fundamental question under the fourth amendment is whether, 'the grounds for a search . . . satisfy objective standards' of reasonableness."  The Ninth Circuit explained that strip searches of detainees based on reasonable suspicion are allowable where the objective is to detect contraband which poses a threat to the safety and security of the penal institution.  *Id.* at 1447.  *See also, Bull*, 595 F.3d at 981 (holding that "the rights of arrestees placed in custodial housing with the general jail population 'are not violated by a policy or practice of strip searching each one of them as part of the booking process, provided that the searches are no more intrusive on privacy interests than those upheld in the *Bell* case," and the searches are "not conducted in an abusive manner.'") (quoting  *Powell v. Barrett,* 541 F.3d 1298, 1314 (11th Cir. 2008)).

In *Cates v. Stroud,* 976 F.3d 972, 985 (9th 2020), the Ninth Circuit elucidates on what constitutional rights prison visitors shed at the prison gates.  *Cates* explained that "like prisoners, prison visitors retain only those rights that are consistent with the prison's significant and legitimate security interests.  But visitors' privacy interests, and their threats to prison security, are distinct from those of inmates and detainees."  *Id*. at 979.  The Ninth Circuit determined that, "[a]ny constraints on visitors rights must be 'justified by the considerations underlying our penal system' and their curtailment necessary to the institution's needs."  *Id.*  (quoting *Hudson v. Palmer*, 468 U.S. 517, (1984)).  The *Cates* court also provided the examples of pat-down searches and metal detector screenings of visitors as "relatively inoffensive" searches and "less intrusive" prerequisites to visitation

that could be imposed "without any individualized suspicion, given the weighty institutional safety concerns." *Id.* at 979-80.

After noting that strip searches involving visual body-cavity searches "are dehumanizing and humiliating," the intrusiveness of which "cannot be overstated", the Court of Appeals distinguished between subjecting prisoners from prison visitors to strip searches. *Id.* The Ninth Circuit explained how Supreme Court precedent and its own earlier decisions permit searches of inmates only in limited circumstances, namely those based on "'reasonable suspicion' in order 'to protect prisons and jails from smuggled weapons, drugs or other contraband which pose a threat to the safety and security of penal institutions." *Id.* (citing *Fuller*, 950 F.2d at 1447; *Kennedy v. L.A. Police Dep't*, 901 F.2d 702, 711 (9th Cir. 1990)). Thus, the court held that prison visitors may be strip searched when they threaten prison security if (1) the search is based on reasonable and individualized suspicion and (2) it is justified by a legitimate security concern. *Id.*

In support of a reasonable and particularized suspicion standard, *Cates* discussed at length when a prison visitor may be intrusively searched for the purpose of detecting contraband: citing *Burgess v. Lowery*, 201 F.3d 942, 945 (7th Cir. 2000) (noting the series of unbroken decisions by its sister courts, stretching back four decades, establishing that subjecting prison visitors to strip searches was unconstitutional in the absence of reasonable suspicion that the visitor was carrying contraband); *Blackburn v. Snow*, 771 F.2d 556, 556-57 (1st Cir. 1985) and *Calloway v. Lokey*, 948 F.3d 194, 202 (4th Cir. 2020) (stating that "the standard under the Fourth Amendment for conducting a strip search of a prison visitor – an exceedingly personal invasion of privacy – is whether the prison officials have a reasonable suspicion, based on particularized and individualized information, that such search will uncover contraband on the visitor's person on that occasion." ).

In dicta, *Cates* recognized "existing case law has already clearly established that a strip search of a prison visitor conducted without reasonable suspicion is unconstitutional," as if it were an unassailable principle of long standing. *Cates*, 976 F.3d at 985.

Under the reasonable suspicion standard, prison officials can justify the strip search of a particular visitor by pointing to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience. *See Terry v. Ohio,* 392 U.S. 1, 21, 27 (1968).   Inchoate, unspecified suspicions fall short of providing reasonable grounds to suspect that a visitor will attempt to smuggle drugs or other contraband into the prison. *Id.* at 22; *see also Hunter v. Auger*, 672 F.2d 668, 675 (8th Cir. 1982) ("in the absence of reasonable articulable grounds to suspect a particular visitor of an attempt to smuggle drugs or other contraband by secreting them on his person, a strip search of that visitor is unreasonable under the fourth amendment.")   And a justifiable legitimate security concern "will not exist when the visitor is not in a position to introduce contraband into the prison." *Cates*, 976 F.3d at 980.   Thus, after setting forth decisions in the Sixth, Seventh and Eighth Circuits and its own precedent on prison searches, the *Cates* court stated:

> Because the ability of prison officials to conduct strip searches of visitors based on reasonable suspicion is premised on the need to prevent introduction of contraband into the prison, a search of a visitor who no longer intends to enter the portion of the prison where contact with a prisoner is possible, or who was leaving the prison, must rely on another justification.   Ordinarily, a visitor cannot introduce contraband into a prison simply by appearing in the administrative area of the prison.   If prison officials have reasonable suspicion that such a visitor is carrying contraband, the prison's security needs would justify a strip search only if the visitor insists on access to a part in the prison where transfer of contraband to a prisoner would be possible.   If the visitor would prefer to leave the prison without such access, the prison's security needs can be satisfied by simply letting the visitor depart."

*Id.* at 982.

As pled, Fitzgerald was the subject of a random visual body-cavity strip search that was conducted without reasonable suspicion and unjustified by any legitimate security concern. (*See, e.g*., Compl. at ¶¶ 79-80 ("On September 28, 2019, and consistent with the policy or practice of Defendants POLLARD and DOE 1, Defendant LITTLE randomly selected Plaintiff for an unclothed strip search. Defendants had no reasonable suspicion to believe that Plaintiff was going to attempt to smuggle contraband into the Prison, that she

committed a crime, or that she intended to commit a crime."); *see also id*. at ¶¶ 17, 50, 79, 80, 98, 99.)

The court, therefore, concludes that Defendants violated Plaintiff's rights under the Fourth Amendment by subjecting Plaintiff to a visual body-cavity strip search without reasonable and individualized suspicion.  *See Cates*, 976 F.3d at 985 ("Existing case law has already clearly established that a strip search of a prison visitor conducted without reasonable suspicion is unconstitutional.").  Having sufficiently alleged that the search was randomly conducted without reasonable suspicion, the court need not reach the question of whether Plaintiff was given the option of specifically leaving the prison rather than being subjected to the search.

### 2. *Qualified Immunity*

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Wilson v. Lane,* 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  In determining the applicability of the qualified immunity doctrine, the court conducts a two-part test to decide: (1) if the alleged facts show a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of defendant's alleged misconduct.  *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

An individual's clearly established rights are only violated by a defendant when "'the state of the law' at the time of an incident provided 'fair warning' to the defendant that his or her conduct was unconstitutional."  *Tolan v. Cotton,* 572 U.S. 650, 656, (2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  In other words, "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citation omitted).  *See also Anderson v. Creighton*, 483 U.S. 635, 640

(1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").  The Supreme Court has stated that "the clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019).  Ordinarily a court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

A court "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." *Jessop v. City of Fresno*, 936 F.3d 937, 941 (9th Cir 2019) (quoting *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005)).  *See also District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90, (2018) (stating that we must look first to binding precedent, then we may consider a "robust consensus of cases of persuasive authority").  But "while unpublished decisions of district courts may inform our qualified immunity analysis ... it will be a rare instance in which, absent any published opinions on point or overwhelming obviousness of illegality, we can conclude that the law was clearly established on the basis of unpublished decisions only'" *Rico v. Ducart*, __ F.3d__, 2020 WL 6814679, at *7 (9th Cir. Nov. 20, 2020) (quoting *Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002)); *see also* 9th Cir. R. 36-3(a) (unpublished dispositions are not precedential).

Notwithstanding these guidelines, "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590.  Thus, "[w]hen a violation is obvious enough to override the necessity of a specific factual analogue, ... it is almost always wrong for an officer in those circumstances to act as he did." *Sharp v. Cnty. of Orange*, 871 F.3d 901, 912 (9th Cir. 2017).

"Training materials and regulations are also relevant, although not dispositive, to determining whether reasonable officers would have been on notice that their conduct was unreasonable." *Vazquez v. Cnty. of Kern*, 949 F.3d 1153, 1165 (9th Cir. 2020) (citing *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir.

2003); *see also Hope v. Pelzer*, 536 U.S. 730 (2002) (considering an Alabama Department of Corrections regulation and a Department of Justice report in its qualified immunity analysis)).

Defendants' argument that the exact parameters of official authority to institute a policy of randomly strip-searching prison visitors were not clearly established before the Ninth Circuit issued its opinion in *Cates* is not persuasive.[5]  On numerous occasions the Supreme Court has made that clear that no "iron curtain" separates prisons from the reach of the Constitution.  *See, e.g.*, *Wolf v. McDonnell,* 418 U.S. 539, 555–556, (1974); *Pell v. Procunier,* 417 U.S. 817 (1974); *Thornburgh v. Abbott,* 490 U.S. 401, 407 (1989*).*  The Supreme Court has also determined that prisoners retain some Fourth Amendment protections while incarcerated.  *See, e.g., Lanza v. New York,* 370 U.S. 139, (1962); *Bell*, 441 U.S. at 559 (strip searches of prison inmates must be reasonable, and that this reasonableness determination requires the court to balance "the need for the particular search against the invasion of personal rights that the search entails.").  And, as discussed above, the Ninth Circuit determined, pre-*Cates,* that prisoners may be subjected to visual body-cavity strip searches based on "reasonable suspicion" in order to "protect prisons and jails from smuggled weapons, drugs or other contraband, which pose a threat to the safety and security of penal institutions."  *Fuller*, 950 F.2d at 1447; *see also Kennedy*, 901 F.2d at 715.

---

[5] The court is mindful that the language of *Cates*, "[e]xisting case law has already established that a strip search of a prison visitor conducted without reasonable suspicion is unconstitutional," may be interpreted as dicta.  *Cates*, 976 F.3d at 985.  The court is also aware that Cates was decided one year after the Defendants' alleged violation and therefore, it would be inappropriate to view it as controlling authority.  Moreover, this case is readily distinguishable because Plaintiff specifically alleges that Defendants had no reasonable suspicion to believe that she was smuggling contraband into the prison on which to base the body cavity strip search.  *See* Compl. ¶ 50.  ("Defendants had no reasonable suspicion to believe that Plaintiff was going to attempt to smuggle contraband into the Prison, that she committed a crime, or that she intended to commit a crime.").

The admonition of *Blackburn* over 35 years ago, that absent an unusual need, "the Constitution requires a more particularized level of suspicion before individuals wishing to visit a jail may permissibly be subject to a strip search," stands just as true today. *Blackburn*, 771 F.2d at 564-65.  Indeed, this "basic constitutional norm" is so obvious that the case law in this area focuses on the constitutional protections afforded detainees and prison visitors who have been *suspected* of carrying contraband – namely the reasonable suspicion standard.   If searches of prisoners must be reasonable, logic and common sense dictate that searches of those not detained must at least meet this minimal standard.  In other words, if reasonable suspicion is required to search someone suspected of carrying contraband, the obvious illegality of conducting a random visual body-cavity strip search of a prison visitor absent reasonable suspicion violates the most fundamental principles of personal privacy and dignity for which the Fourth Amendment stands. *Wesby,* 138 S. Ct. at 590 ("there can be a rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances."). *See also Terry,* 392 U.S. at 22 (to justify even the intrusion on personal privacy involved in a pat frisk of outer clothing, more than an "inarticulate hunch" of wrongdoing is required).  Moreover, this court can find no support for the proposition that a random body-cavity strip search of a prison visitor may be performed when no reasonable and individualized suspicion is required.

Looking to sister circuits as of the date of the alleged incident, we see further support for the proposition that a strip search of a prison visitor not based on reasonable suspicion was already established as unconstitutional and beyond debate. *See al-Kidd*, 563 U.S. at 741 ("existing precedent must have placed the ... question beyond debate.").  In her briefing Plaintiff cites to *Daugherty v. Campbell*, 935 F.2d 785 (6th Cir. 1991), *Burgess v. Lowery*, 201 F.3d 942, 945 (7th Cir. 2000), *Blackburn v. Snow*, 771 F.2d 556, 562 (1st Cir. 1985); *Thorne v. Jones*, 765 F.2d 1270, 1276 (5th Cir. 1985); *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982); *Martinez v. County of San Diego*, 962 F.2d 14 (at *2, n.7) (9th Cir. 1992); and *Mack v. Williams*, 2019 WL 4675365 at 7 n.7 (D. Nev. Sept. 25, 2019) to illustrate that

14

the right was clearly established at the time of the incident.  (Doc. No. 13 at 12-17.)  Three cases, *Blackburn*, *Thorne* and *Hunter* are worth discussing in more detail because they are consistently cited by other courts, including *Cates*, when analyzing what, if any, protections the Fourth Amendment affords to prospective visitors to penal institutions regarding body-cavity strip searches.

Of the cases cited by Plaintiff the most factually analogous is *Blackburn v. Snow,* 771 F.2d 556 (1st Cir. 1985).  In *Blackburn*, Sheriff Linwood Snow had instituted a policy that mandated that all visitors to the Plymouth County Jail be strip searched, regardless of whether or not there was cause to believe the visitor was carrying contraband.  *Blackburn*, 771 F.2d at 559.  When plaintiff Ruth Blackburn arrived at the jail she saw a sign posted announcing that all visitors would be "skin searched."  *Id*. at 560.  She submitted, on three separate occasions, to these strip searches in order to be allowed to visit her brother.  *Id.* The strip searches involved female officers examining Blackburn's armpits, lifting her breast area and crouching to view her anus.  *Id*.  After completion of the third strip search, Blackburn was informed, without being told why, that she had been barred from visiting the jail.  *Id.* Sheriff Snow later testified that he given this order because he believed that Blackburn had made an obscene gesture towards him at the close of a conversation between them at the end of the visit that occurred after Blackburn's second strip search.  *Id*. Blackburn later challenged the constitutionality of the policy.  *Id.*

Sheriff Snow never disputed that Blackburn was not suspected of attempting to secretly bring contraband into the institution.  *Id.*  As explained by the First Circuit, the Sheriff "emphatically stated that Blackburn was strip searched as a matter of routine procedure which, under the terms of his order, applied equally to all visitors—including infants and children.  Indeed, the Sheriff believed that it was in the very uniformity of the strip search policy in which its fairness inhered; by strip searching all visitors, without regard to any individualized suspicion." *Id*. at 560-61.  *Blackburn* concluded that "a rule requiring *all* prison visitors to submit to a body cavity strip search, without *any* predicate

requirement of individualized suspicion or showing of special and highly unusual institutional need, cannot satisfy the Fourth Amendment." *Id.* at 562. The court explained:

> we think it is clear that society is 'prepared to recognize' that free citizens entering a prison, as visitors, retain a legitimate expectation of privacy, albeit one diminished by the exigencies of prison security. To be sure, those visiting a prison cannot credibly claim to carry with them the full panoply of rights they normally enjoy. But neither may they constitutionally be made to suffer a wholesale loss of rights—nor even one commensurate with that suffered by inmates.

*Id.* at 563.

The court noted that its holding was in accord with all the published federal court opinions of which it was aware that involve Fourth Amendment challenges by prison visitors.[6] As here, the defendants in *Blackburn* also argued that the strip searches did not violate the Fourth Amendment because Blackburn consented to them. *Id.* at 567. The First Circuit was not persuaded by this argument, finding the number of times Blackburn had signed visitor slips consenting to a search of her person and property and the fact that she was free to leave the jail and forego the visit to be irrelevant. *Id.* The court found, as a matter of law, Blackburn's submission to the searches under the circumstances could not properly constitute consent because her access to the jail was impermissibly conditioned on that submission. *Id.* The Court of Appeals stated, "it has long been settled that government may not condition access to even a gratuitous benefit or privilege it bestows upon the sacrifice of a constitutional right." *Id.* at 568. The court cited *Frost v. Railroad Commission,* 271 U.S. 583, 593–94 (1925), and several other cases to illustrate how the doctrine of unconstitutional conditions has been applied in the context of numerous constitutional protections. *Id.* Thus, the court concluded:

---

[6] In support the court cited *Hunter,* 672 F.2d 668, *Thorne v. Maggio,* 585 F. Supp. 910 (M.D.La.1984); *Black v. Amico,* 387 F. Supp. 88 (W.D.N.Y.1974); *cf. Security & Law Enforcement Employees v. Carey,* 737 F.2d 187 (2d Cir.1984) (prison employees retain limited expectation of privacy).

[i]rrespective of whether Blackburn had a constitutional right to visit the Jail, as the district court thought, or a mere privilege, as the appellants argue, the principle established in the cases we have cited is that the Sheriff was not free to condition the visitation opportunity on the sacrifice of Blackburn's protected Fourth Amendment rights. Nor is it any answer to say that Blackburn could have left at any time, or declined to return after the first strip search, for it is the *very choice to which she was put* that is constitutionally intolerable—and it was as intolerable the second and third times as the first.

*Id.*

In *Hunter v. Auger,* 672 F.2d 688 (8th Cir. 1982), a handful of prison visitors were selected for strip-searches at three Iowa state penitentiaries on the basis of anonymous and uncorroborated tips that they would be attempting to smuggle drugs into the facilities. The visitors were, like Fitzgerald, given the option of submitting to the search or foregoing their visits. *Hunter*, 672 F.2d at 670-671. Two visitors acquiesced to the searches in order to visit inmates, others did not. *Id.* The searches did not turn up any contraband. *Id.* The prisoner officials freely admitted, "even though attempts to corroborate an unidentified informant's tip are unsuccessful, a strip search notation may nevertheless be placed near a visitor's name on an inmate's visiting card." *Id.* at 673. Such notations could remain on an inmate's visiting card indefinitely. *Id.*

The Eight Circuit held that a strip search of a prison visitor is unreasonable under the Fourth Amendment in "the absence of reasonable, articulable grounds to suspect a particular visitor of an attempt to smuggle drugs or other contraband by secreting them on his person." *Id.* at 675. In so finding the court reasoned:

After weighing the interest of correctional officials in preserving institutional security against the extensive intrusion on personal privacy resulting from a strip search, we conclude that the Constitution mandates that a reasonable suspicion standard govern strip searches of visitors to penal institutions.
…

To justify the strip search of a particular visitor under the reasonable suspicion standard, prison officials must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience…

*Id.* at 674.  The court explained that the standard it was adopting required "individualized suspicion, specifically directed to the person who is targeted for the strip search."  *Id.* at 675.  The *Hunter* court concluded by outlining:

> In the context of strip searches of visitors to correctional facilities, prison officials must have reasonable grounds, based on objective facts, to believe that a particular visitor will attempt to smuggle contraband by secreting and carrying it on his person. While we recognize that reason to suspect a visitor of smuggling contraband may require a body search since the nature of the criminal activity is the concealment of contraband on the person, we emphasize that a generalized suspicion of smuggling activity is insufficient to justify the extensive intrusion of a strip search.

*Id.*

In *Thorne v. Jones*, 765 F.2d 1270 (5th Cir. 1985) Mr. and Mrs. Thorne separately attempted to visit their two sons who were being held at Louisiana State Penitentiary on two consecutive days.  Prior to the Thornes' visits a shift commander had received information from an inmate that Scott Thorne was regularly receiving narcotics through the visiting room, probably from his mother.  *Thorne*, 765 F.2d at 1271. On the warden's instructions all shifts were notified that Mrs. Thorne was to be asked to submit to a strip search before being allowed to visit her son.  *Id.*  Faced with the choice of either submitting to the strip search or foregoing the visit, Mrs. Thorne left the prison.  *Id.*  The next day, Mr. Thorne arrived at prison to visit his son.  *Id.*  Upon being told that a search would be required, he consented to the search, no contraband was found, and the visit took place.  *Id.* The Thorne family sued, with Mr. Thorne alleging a violation of his Fourth Amendment right to be free from unreasonable searches.  *Id.*

Citing, *Hunter* and *Security and Law Enforcement Employees, District Council 82 v. Carey,* 737 F.2d 187, 205 (2d Cir.1984) (adopting *Hunter's* reasonable suspicion standard for strip searches of prison employees), the Fifth Circuit found no authority for the prison's proposition that strip searches of prison visitors are *per se* reasonable as a matter of law.  *Id.* at 1276.  Next, the court rejected the arguments that either Mr. Thorne consented to the search or that he waived his Fourth Amendment rights when he entered

the prison. *Id.* As in this case, the prison pointed to the form Mr. Thorne signed and the warning notices posted at the prison gates. *Id.* However, the court explained "[i]f accepted, this argument would render reasonable a strip search of any such prison visitor; as discussed above, such at-will, random searches are not reasonable under the Fourth Amendment." *Id.* (citing *Carey,* 737 F.2d at 202 n. 23 (rejecting similar "consent" argument)).

Turning to the strip search of Mr. Thorne, the Firth Circuit concluded the search to "to have been without reasonable suspicion, and therefore in violation of the fourth amendment." *Thorne*, 765 F.2d at 1277. The court noted the absence of any specific objective facts upon which reasonable suspicion could have been grounded, explaining: "'reasonable suspicion' must be specifically directed to the person to be searched.... [T]he fourth amendment does not permit any automatic or casual transference of 'suspicion.'" *Id.* (quoting *United States v. Afanador,* 567 F.2d 1325, 1331(5th Cir. (1978)). The court went on to quote the reasonable suspicion standard set forth in *Hunter*.[7]

Further, the court's research revealed additional earlier cases from sister circuits requiring reasonable and particularized suspicion before a prison visitor may be constitutionally strip searched. *See, e.g., Wood v. Clemons,* 89 F.3d 922, 929 (1st Cir. 1996) (explicitly stating "'reasonable suspicion' is indeed the proper standard by which to gauge the constitutionality of prison-visitor strip searches. That standard guards against arbitrary or clearly unfounded searches by placing non-trivial constraints upon the ability of prison officials to strip search visitors."); *Varrone*, 123 F.3d 75, 79 (2d Cir. 1997) ("correctional officers needed reasonable suspicion to strip search prison visitors  without violating their constitutional rights"); *Spear*, 71 F.3d at 632 (6th Cir. 1995) (holding that a

---

[7] "To justify the strip search of a particular visitor under the reasonable suspicion standard, prison officials must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience. Inchoate, unspecified suspicions fall short of providing reasonable grounds to suspect that a visitor will attempt to smuggle drugs or other contraband into the prison." *Hunter*, 72 F.2d at 674.

digital body-cavity search of a prison visitor "may be conducted only when there is reasonable suspicion [and] also demands that the person to be subjected to such an invasive search be given the opportunity to depart"); *Smothers v. Gibson*, 778 F.2d 470, (8th Cir. 1980) ("While prison officials have the right to conduct reasonable searches of prison visitors, with far greater latitude than in other settings, the right to indiscriminately strip search anyone who enters is not and cannot be authorized."). Coupled with *Blackburn*, *Hunter* and *Thorne*, these cases provide "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson,* 526 U.S. at 613.

Further, California's own state regulations governing prison visitors support the conclusion that the Fourth Amendment right asserted by Plaintiff was delineated clearly at the time of the September 2019 search. *See Vasquez*, 949 F.3d at 1165 ("Training materials and regulations are relevant …to determining whether reasonable officers would have been on notice that their conduct was reasonable.) Title 15, section 3173.2 provides that inspection of a visitor's person, personal property and vehicle(s) may occur when there is reasonable suspicion to believe the visitor is attempting to introduce or remove contraband or unauthorized items or substances into or out of the institution/facility. CAL CODE REGS. tit. 15, § 3172.2. Further, section 3173.2(d)(7) defines an unclothed body search as:

> a security procedure that involves visual inspection of a person's body with all of their clothing removed and a thorough inspection of the person's clothing for purposes of detecting contraband. This procedure may be conducted with the visitor's consent when there is a reasonable suspicion that the visitor is carrying contraband and when no less intrusive means are available to conduct the search.

CAL CODE REGS. tit. 15, § 3173.2(d)(7).

In sum, the obviousness of the alleged unlawful conduct, the consensus of persuasive authority and the state regulations existing at the time Officers Pollard, Moore Cruz, Jackson and Little alleged act made it clear to "any reasonable officer" in their position that conducting a random visual body-cavity strip search of a prison visitor without

reasonable suspicion was unconstitutional.  *See Sheehan*, 135 S. Ct. at 1774 ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it …).  Accordingly, at this stage of the litigation, this court cannot conclude that Defendants are entitled to qualified immunity and **DENIES** the motion to dismiss on this ground.

### B. Failure to Train Claim Brought Against Pollard

Defendants argue that because Plaintiff fails to state a Fourth Amendment violation, and because Defendants are entitled to qualified immunity for any alleged violation, the failure to train claim against Pollard should be dismissed.  (Doc. No. 8 at 21-22.)

Under 42 U.S.C. § 1983, "[e]very person who, under color of any statute ... custom, or usage of any State ... subjects, or causes to be subjected, any ... person within the jurisdiction of [the United States] to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."  A state official is not vicariously liable for the deprivation of constitutional rights by employees.  *Monell v. N.Y.C. Dept. of Soc. Services*, 436 U.S. 2018, 694(1978).

Here, to sufficiently allege her claim, Plaintiff must allege that Pollard, in his individual capacity, "was deliberately indifferent to the need to train subordinates, and the lack of training actually caused the constitutional harm or deprivation of rights."  *Flores v. Cnty. of L.A.* 758 F.3d 1154. 1159 (9th Cir. 2014) (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1358, (2011)).  This means that Plaintiff must allege facts to show that Pollard "disregarded the known or obvious consequence that a particular omission in the training program would cause [prison] employees to violate citizens' constitutional rights."  *Id.* (citation omitted).   A "pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train."  *Connick,* 131 S. Ct. at 1360.

It is alleged that Pollard "failed to train and supervise Prison corrections officers in the Constitutional requirements for unclothed searches of visitors." (Compl. ¶ 97.)  It is also alleged that during the class period:

> it was clearly established in the Ninth Circuit and all other circuits that strip searches of prison visitors are permissible only when prison officials can point to specific objective facts and rational inferences establishing individualized reasonable suspicion to believe that the person targeted for the strip search will attempt to smuggle contraband by secreting and carrying it on his or her person.

*Id.* ¶ 96.  As explained, the court has concluded that Plaintiff has sufficiently alleged a Fourth Amendment violation.  (*See supra*, section IV, A, 1.)  Moreover, Plaintiff specifically identifies Pollard as the warden of the prison, and that "Plaintiff was being searched because Pollard had requested it." (*Id.* ¶¶ 3, 17, 95.)  And, it is alleged that "on September 28, 2019, as a proximate result of the lack of training and supervision at the Prison, Defendant LITTLE randomly selected Plaintiff for an unclothed search." (*Id.* ¶ 98.)  *See Starr v. Baca,* 652 F.2d 1202, 1208 (9th Cir. 2011) (casual connection may be established by the supervisor's "own culpable action or inaction in the training, supervision or control of his subordinates; … his acquiescence in the constitutional deprivation; or … conduct that showed a reckless or callous indifference to the rights of others.")  Additionally, according to the complaint, "Defendants conduct invasive strip and visual body-cavity searches pursuant to a policy or practice that does not require any particularized suspicion that the visitor is concealing anything in his/her body cavities." (Compl. ¶¶ 20, 103.)  Relatedly, it is alleged that Plaintiff "was advised by another Prison visitor that such a search was common practice and that she too had to undergo a strip search before she was permitted to visit an inmate." (*Id.* ¶¶ 31, 110.)  See *Connick,* 131 S. Ct. at 1360 (a pattern of similar constitutional violations by untrained employees normally demonstrates deliberate indifference).  Finally, Plaintiff alleges that the moving force behind the unclothed search of Plaintiff and the class members "was the lack of training

and supervision [] regarding the Constitutional requirements of unclothed visitor searches." (Compl. at ¶ 112.)

As currently pled, Plaintiff has sufficiently alleged facts which "might plausibly suggest" that Pollard "disregarded the known and obvious consequences" of failing to educate officers on the need to have reasonable suspicion that a prison visitor is trying to smuggle contraband into the prison before conducting a visual body-cavity strip search, thereby causing prison officers to violate vistors' constitutional rights. *Flores,* 758 F.3d at 1159. Accordingly, the court **DENIES** Defendants' motion to dismiss the failure to train claim brought against Pollard.

### C. Plaintiff's Consent

Defendants contend that Plaintiff's complaint should be dismissed because it illustrates that she consented to the search before it happened, she did not limit the search's scope nor object to it when it began to exceed what she assumed it would entail, and officers in Defendants' positions would have reasonably believed that Plaintiff consented to the search that was performed.

Ordinarily, "a search conducted pursuant to a valid consent is constitutionally permissible." *United States v. Mendenhall*, 446 U.S. 544, (1980); *Schneckloth v. Bustamonte*, 412 U.S. 218, (1973). Whether consent has been feely given is based on an examination of the totality of the circumstances. *Schneckloth,* 412 U.S. at 222, 229 ("In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents."); *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 437 (9th Cir. 2010).

The Ninth Circuit has identified five factors a court should consider when determining whether a person voluntarily consented to a search: (1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be

obtained." *United States v. Patayan*, 361 F.3d 494, 502 (9th Cir. 2004). The voluntariness of a consent to a search is a question of fact to be determined from the totality of the circumstances. *Id.* at 501. The Ninth Circuit has recognized that "each factual situation surrounding consent is unique," and a court "may take into account any other factors that [it] deem[s] relevant." *Liberal v. Estrada*, 632 F.3d 1064, 1082 (9th Cir. 2011).

Here, because Plaintiff is alleging that she did not knowingly consent to the strip search, Defendants bear the burden of proving that her consent was, in fact, freely and voluntarily given. *Crowe*, 608 F.3d at 437. *See also Schneckloth*, 412 U.S. at 222. Defendants rely heavily on the Consent to Search Form Plaintiff signed as evidence that she consented to the search. While Defendants refer to the Form as Exhibit A, s*ee* Doc. No 8 at 17-18, no exhibit was attached to the motion. As such, the court cannot consider the contents of the Request to Search Form and must rely on the allegations contained in the complaint.[8]

It is alleged that the Request to Search Form did not state that the search would include invasive measures such as removing all clothes, including undergarments, nor require Plaintiff to spread her butt cheeks and cough multiple times while a guard visually inspected her "private parts." (Compl. ¶ 19.) Plaintiff also claims she acquiesced to a search "that she understood to be non-intrusive." (*Id.* ¶ 21.) And, Plaintiff alleges that had she not consented to the search, she would have not been allowed to visit Roberts. (*Id.* ¶ 16.) Further, it is alleged that the search was conducted in a small room about the size of a walk-in closet, and performed by two Corrections Officers Jackson and Little, with Officer Jackson standing by the door. (*Id.* ¶¶ 25, 27.) Once Plaintiff had voluntarily removed her top and pants, she was told by Little that "everything had to be removed so

---

[8] The fact that the Request to Search Form was later attached as an Exhibit to Defendants' Supplemental Brief, *see* Doc. No. 18-1 at 3, does not alter the court's position. As a consequence, any determination of whether the Form establishes reasonable suspicion would not be appropriate.

that a body-cavity search could be performed." (*Id.* ¶ 27.)  Little told Plaintiff to "bend over, spread her butt cheeks, and cough" and then "Little instructed Plaintiff to lift her breasts." (*Id.*)  Although Plaintiff asked Little what was going on, it is not alleged that she objected to the visual body-cavity search. (*Id.* ¶ 26.)  Absent from the complaint are allegations that Plaintiff was given the option of leaving before the visual body-cavity portion of the strip search began or that the officers informed Plaintiff that a search warrant could be obtained.

For purposes of the motion to dismiss, the court accepts as true the factual allegations of the complaint that Plaintiff did not consent to the visual body-cavity strip search.  The voluntariness of Plaintiff's consent is a question of fact that is not appropriate for determination at the pleading stage.  Accordingly, the court **DENIES** Defendants' motion to dismiss brought on this ground.[9]

## V.    CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is **DENIED**. Defendants have up to and including ***January 13, 2021*** to answer Plaintiff's complaint.

IT IS SO ORDERED.

Dated:  December 22, 2020

_____
Hon. Jeffrey T. Miller
United States District Judge

---

[9] Because the court has concluded that it is not appropriate to determine the voluntariness of Plaintiff's consent on the pleadings, the court declines to address any arguments related to whether requiring Plaintiff to sign the standard Request for Search Form in order to enter the prison constitutes valid consent.  The court does, however, note the First Circuit's directive in *Blackburn v. Snow*, 771 F.2d 556, 567, (1st Cir. 1985), that "it has long been settled that government may not condition access to even a gratuitous benefit or privilege it bestows upon the sacrifice of a constitutional right."