1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16

| | |
|---|---|
| RHONDA FITZGERALD, an individual, and on behalf of all persons similarly situated,<br><br>                                   Plaintiff,<br><br>v.<br><br>MARCUS POLLARD, et al.,<br><br>                                   Defendants. | Case No.:  20cv848 JM(NLS)<br><br>**ORDER ON MOTION FOR SUMMARY JUDGMENT** |

17      Presently before the court is a motion for summary judgment filed by Defendants C.

18  Moore, M. Pollard, A. Jackson, C. Mann-Little, and H. Cruz.  (Doc. No. 41.)  The motion

19  has been fully briefed and the court held oral argument on August 23, 2021.  For the reasons

20  set forth below, the motion is **denied**.

21      **I.      BACKGROUND**

22      This federal civil rights action (42 U.S.C. §1983) with pendant state claims arises

23  out of a strip search of Plaintiff Rhonda Fitzgerald that occurred on September 28, 2019,

24  when she visited the Richard J. Donovan Correctional Facility to see her friend, inmate

25  Christopher Roberts ("Roberts").  (Doc. No. 1, Compl., ¶¶ 2, 13.)

26  ///

27  ///

28  ///

Ms. Fitzgerald filed a declaration as part of her opposition to the motion for summary judgment,[1] (Doc. No. 46), in which she declares that she met inmate Roberts in high school. (*Id.* at ¶ 4.)  She attests that following the death of her parents in 2019 and 2020, Roberts' mother, Patricia Knight, periodically telephoned her and that in early 2019 they developed a friendship.  (*Id.* at ¶ 8.)  Ms. Fitzgerald declares that at Ms. Knight's request, she accompanied Knight on a visit to see Roberts on May 4, 2019.  (*Id.* at ¶ 9.)  This was Ms. Fitzgerald's first visit to Donovan.  (*Id.*)  She then visited Roberts 37 more times leading up to the September 28, 2019 strip search visit.  (*Id*. ¶¶ 10-12, 14-48.)

According to the declaration of Defendant Moore, while working at Donovan Correctional facility in 2019, Moore "learned of inmate Roberts' suspected illegal activities through the exchange of information with Facility E staff," including Defendant Cruz, Officer Fredrick, and Sergeant Eustaquio (Doc. No. 41-10 at ¶¶ 2, 3.)  Moore reviewed inmate Roberts' files, which contained memoranda detailing interviews with four confidential informants dating back to July 2018.  (*Id.* at ¶ 2.)  Moore declares that he:

> had reasonable suspicion that Rhonda Fitzgerald might be attempting to bring drugs into the prison.  The reasonable suspicion was based on my eighteen years of training, education, and experience in CDCR's prisons, the information detailed in the confidential memorandum and found in Roberts' file, and the reasonable and logical inferences that I drew based on all of that information.  Accordingly, I determined that Rhonda Fitzgerald should be asked to consent to an unclothed body search to prevent illicit drugs from being introduced into the prison.

*Id.* at ¶ 15.  Moore further states that he only authorized the "unclothed"[2] search of Ms. Fitzgerald because he "had a strong suspicion and good reasons to believe that she might

---

[1] As of the date of oral argument on this motion, no depositions had been taken in the case. Along with her opposition, Ms. Fitzgerald also filed a Separate Statement of Genuine Disputes and Additional Undisputed Material Facts ("PSS") (Doc. No. 45-1).

[2] At oral argument, defense counsel essentially acknowledged there is only a semantic difference between a strip search and the "unclothed" search conducted under the circumstances of this case, and acknowledged Ms. Fitzgerald had been "strip searched."

2

be attempting to bring contraband drugs into the prison.  My staff and I therefore had reasonable suspicion to search [her]."  (*Id*. at ¶ 28.)

According to the declaration of Defendant Cruz, in 2019, Defendant Moore tasked him with investigating inmate Roberts' suspected drug activity.  (Doc. No. 41-2.)  Cruz also reviewed inmate Roberts' files and the four confidential memoranda.  (*Id*. ¶ 2.)  Cruz declares the information contained in the file details:

> inmate Roberts' reported drug activity on the prison yard, and Rhonda Fitzgerald's possible involvement in that drug activity.  I noted that Rhonda Fitzgerald was specifically named by a confidential informant as assisting inmate Roberts in bringing narcotics into the prison.

*Id*.  ¶ 3.  Defendant Cruz also attests that he:

> had reasonable suspicion that Rhonda Fitzgerald might be attempting to bring drugs into the prison.  The reasonable suspicion was based on my training, education, and experience with CDCR, the information detailed in the confidential memorandum and found in Roberts' file, and the reasonable and logical inferences that I drew based on all of that information.  Accordingly, Lieutenant Moore and I determined that Rhonda Fitzgerald should be asked to consent to an unclothed body search to prevent illicit drugs from being introduced into the prison.

*Id.* at ¶ 15.

The four confidential memoranda relied on by Defendants Cruz and Moore are summarized below:

- A July 3, 2018 memo by Sergeant C. Hernandez details an interview he conducted of a confidential prison informant, ("Confidential Informant # 4.") (Doc. No. 35 at 3-10).  Citing safety concerns over a drug debt, Confidential Informant # 4 approached prison staff on July 3, 2018.  (*Id.* at 3, 7; *see also* Doc. No. 41-2 ¶ 4; Doc. No. 41-10 ¶ 4.)  When interviewed, he identified 3 individuals using the Strategic Offender Management System ("SOMS") report, including inmate Roberts "Inmate ROBERTS, C., H15228, FE-23B-104-2l (AKA: BLACK)."  The memo includes the notation "suspected trafficking from visiting."  *Id.*

- A November 1, 2018 memo by Sergeant D. Eustaquio details an interview he conducted of a confidential prison informant ("Confidential Informant #3.)

3

(Doc. No. 35 at 12-23.)  Fearing for his safety, Confidential Informant #3 approached prison staff stating he was willing to provide information regarding inmates on "Facility E Yard conducting illicit activities." (*Id.* at 12, 18; *see also* Doc. No. 41-2 ¶ 6; Doc. No. 41-10 ¶ 6.)  Confidential Informant #3 identified another inmate as a drug dealer on Facility E's Yard (*id.* at 14, 20) and reported seeing this inmate "meeting up with an inmate they call 'BLACK' almost every weekend right after visits." (*Id.*)  Confidential Informant #3 identified Roberts as Black with the use of SOMS.  (*Id.*)  The memo contains the following notation in parathesis: "a review of SOMS Visitation History confirms that he gets visits from his wife every weekend." (*Id.*)

- A May 1, 2019 memo by Officer Fredrick details an encounter with a confidential prison informant ("Confidential Informant #1") he had on January 15th, 2019.  (Doc. No. 35 at 25-32.)  Confidential Informant #1 offered to provide information regarding "phones" and "dope" "coming into facility [E] every week." (Doc. No. 35 at 26, 30; *see also* Doc. No. 41-2 ¶ 8, Doc. No. 41-10 ¶ 8.)  Confidential Informant #1 identified inmate Roberts, AKA: Black, as one of the main inmates who was pushing to introduce contraband into the institution.  (*Id.*)  The memo reports that Confidential Informant #1 went on to claim that "Inmate Roberts will bring stuff back through regular and family visits through his wheelchair." (*Id.*)  As recorded in the memo, Confidential Informant #1 also told Officer Fredrick that Roberts "has a super 3 radio that sometimes has liquid heroin inside and holds his cellphone in his knee brace that he wears around, … [and that he] uses inmates in [specific] units to hold his phones while he waits for payments." (*Id.*)  The memo states that Confidential Informant #1 "witnessed Inmate Roberts processing Green dot transaction through programs such as Venmo and Paypal.  The accounts associated are @Rhonda-Fitzgerald-2 (venom) [sic] and RFKelly-2004@yahoo.com (Paypal).  (*Id.*)

- A "Kite" (written note) from Confidential Informant #1 is attached.  It contains a lot of the information in the memorandum.  The Kite is not dated but states: "Family Visit Cancelled for 6-6-19.[3]"  The Kite also states "Plan B – Roberts went to visit on Sunday with Rhonda Fitzgerald and picked up an ounce of heroin for him and Daniels!!  Roberts is a porter at mental health

---

[3] At the hearing, the court pointed out it was somewhat concerned by the fact the "19" portion of the 6-6-19 date appears to have been altered.

building.  He keeps his phone [in] brace.  Call him to work at mental health.
Cuff him take him to cage!! Check 2 Low 4 Low. Look inside Black Super III
Radio."  The note contains both the Venmo and PayPal addresses contained
in the memo.

Additionally, Defendants filed a declaration by Officer Fredrick in support of their
motion.  (Doc. No. 41-6.)   Fredrick's declaration clarifies that all of the information
contained in the memo was supplied to him in his encounter with Confidential Informant
#1.  In the declaration, Fredrick does not specify when Confidential Informant #1 gave him
the Kite, he simply declares "sometime later."  *(Id.* at ¶ 6.)  Fredrick concedes that the Kite
was given to him before he drafted the memo on May 1, 2019, stating "I then wrote a
confidential memorandum on May 1, 2018 [sic], detailing the identity of Confidential
Informant #1, the information he conveyed to me verbally, and the information in the kite."
(*Id.* at ¶ 8.)

- A June 13, 2019 memo by Sergeant Eustaquio details a conversation he had
  with a confidential prison informant ("Confidential Informant #2").  (Doc. No.
  35 at 36-43.)  On June 13, 2019, Confidential Informant #2 feared for his
  safety and approached Sergeant Eustaquio after being threatened by another
  inmate because "the black inmates think" he "snitched on them."  (*Id.* at 37,
  41; *see also* Doc. No. 41-2 ¶ 10; Doc. No. 41-10 ¶ 10.)  Confidential Informant
  #2 stated that he believed inmate Roberts aka Black is "behind all this because
  [the inmate who threatened him] works for him and sells his heroin and crystal
  meth to EOP inmates.  Confidential Informant #2 stated that this had been
  going on for several months and he is tired of it and he does not want to ruin
  his release date." (*Id.* at 37-38, 41-42.)

Additionally, Defendants Cruz and Moore recount how inmate Roberts' file
contained two Rules Violation Reports from November 2018[4] and June 2019.[5]  The reports
document how the searching of Roberts' cell resulted in the discovery of cell phones, which
Roberts later claimed ownership of.  (Doc. No. 41-2 ¶ 13; Doc. No. 41-10 ¶ 13.)

---

[4] Doc. No. 41-3 at 3; Doc. No. 41-11 at 3.

[5] Doc. No. 41-3 at 5-6; Doc. No. 41-11 at 5-6.

20cv848 JM(NLS)

Both Defendants Cruz and Moore note that Ms. Fitzgerald visited inmate Roberts 38 times, beginning on May 5, 2019. (Doc. No. 41-2 ¶ 14; Doc. No. 41-10 ¶ 14.) They attest that Ms. Fitzgerald was, with two exceptions, inmate Roberts' only visitor during this period. Cruz claims this is important information because Confidential Informants #1 and #4 stated that inmate Roberts received his drugs from his visitors and brought them back to the Facility after his visits. (*Id*.)

Defendants Cruz and Moore declare that they discussed what they had learned about inmate Roberts and his suspected drug activity on Facility E, including the contents of the memos. (Doc. No. 41-2 ¶ 3; Doc. No. 41-10 ¶ 12.) After deciding that they had reasonable suspicion to search Ms. Fitzgerald, Cruz and Moore maintain that they prepared and signed a Notice of Consent to Search Form. (Doc. No. 41-2 ¶ 17; Doc. No. 41-10 ¶ 20.) On the morning of September 28, 2019, Moore and Cruz attest that they informed Defendant Mann-Little that there was reasonable suspicion to search Ms. Fitzgerald and instructed her to ask Ms. Fitzgerald to consent to an unclothed body search. (*Id*.) Moore and Cruz declare they gave Mann-Little the signed Notice of Request for Search Form. (*Id*.)

According to the declaration of Defendant Mann-Little (Doc. No. 41-8), during the morning staff meeting on September 28, 2019, Defendants Moore and Cruz informed her that prison staff had confidential information supporting reasonable suspicion that Ms. Fitzgerald may have been bringing contraband into the prison and asked her to see if Ms. Fitzgerald would submit to an unclothed body search. (*Id*. ¶ 8.) Mann-Little attests that she was provided with a Notice of Request for Search Form signed by Cruz. (*Id*. ¶ 10.) Mann-Little recounts she was not privy to the exact nature of the information that formed the basis of Moore's and Cruz's reasonable suspicion. (*Id*. ¶ 9.)

Defendant Mann-Little declares that when she saw Ms. Fitzgerald on the morning of September 28, 2019, she:

> privately asked Ms. Fitzgerald if she would consent to undergoing an unclothed body search. Ms. Fitzgerald asked me why I was making this request. I informed Ms. Fitzgerald that prison staff suspected that she may be

> attempting to introduce contraband into the facility, and that my supervisors were requiring the search.
>
> I explained to Ms. Fitzgerald exactly what the unclothed body search entailed. I informed her that I would ask her to remove all of her garments, including her under garments, and that I would be visually inspecting her body for any contraband. I also informed Ms. Fitzgerald that she could refuse to consent to the search, and that if she did, she would be denied her visit to inmate Roberts for that day only.

*Id*. at ¶¶ 13, 14. Further, Defendant Mann-Little attests that Ms. Fitzgerald agreed to consent to the unclothed body search, read the Notice of Request to Search Form and voluntarily signed it. (*Id*. ¶¶ 15, 16; *see also* Doc. No. 41-9.)

In her declaration, Ms. Fitzgerald sets forth a very different version of her interaction with Defendant Mann-Little. Ms. Fitzgerald declares that Mann-Little asked if she would consent to an unclothed search, that she was informed that it was random, and that it was being requested by the warden. (Doc. No. 46 ¶¶ 51, 53-58.) Ms. Fitzgerald attests that she understood from prior visits that the "unclothed" search was a condition of seeing Roberts and, having driven 175 miles to see Roberts, she acquiesced and signed the Notice of Request for Search Form. (*Id*. ¶¶ 52, 61, 62.) Before she signed the form, Ms. Fitzgerald declares that Mann-Little did not describe what an "unclothed" search would entail and that she had assumed it would simply require her removing her top and pants and being patted down to search for guns and contraband. (*Id*. ¶ 59.) Ms. Fitzgerald maintains that Mann-Little did not explain that she could refuse consent or the consequences of such a refusal. (*Id*. ¶ 60.)

Regarding the Notice of Request for Search Form, Ms. Fitzgerald declares that she did not read the paragraph that stated: "Institution staff has cause to suspect that you might be carrying some contraband." (*Id*. at ¶ 64.) She also declares that Defendant Mann-Little "did not direct her attention to this pre-printed paragraph." (*Id*.) She attests that she had no idea that signing the Form would allow Mann-Little to perform a body cavity search. (*Id*. ¶ 65.) In her declaration, Ms. Fitzgerald notes that Defendants did not comply with

7

California state regulations requiring the use of metal detectors, hand-held wands, and drug-sniffing dogs before the use of strip searches. (*Id.* ¶ 69.)

Defendant Mann-Little recounts that after Ms. Fitzgerald signed the Notice of Request for Search Form, she requested Defendant Jackson help her with the search of Fitzgerald. (Doc. No. 41-8 ¶ 16.) Once all three were sequestered in the private room with the door closed, Mann-Little declares that she again informed Ms. Fitzgerald that: (1) she would be asking Ms. Fitzgerald to removal all garments, included her undergarments; (2) she would be inspecting Ms. Fitzgerald's body for any contraband; and (3) Ms. Fitzgerald could refuse to consent to the search, and stop the search at any point if she felt uncomfortable. (*Id.* ¶ 17.) Mann-Little attests that she explicitly informed Ms. Fitzgerald at multiple times during the search that Ms. Fitzgerald could stop the search at any point, and that Ms. Fitzgerald acknowledged that she understood, but that at no time did Ms. Fitzgerald withdraw her consent, say that she was stopping the search, ask to speak with a supervisor, or object to the search in any way. (*Id.* ¶ 19.) Mann-Little states that Ms. Fitzgerald understood that she could refuse to consent to the search and that she would be free to leave the prison if she did so. (*Id.*) Additionally, Mann-Little recalls Ms. Fitzgerald saying: "words to the effect that she would undergo the search if that is what she had to do to visit inmate Roberts." (*Id.*) Mann-Little declares that she did not hear Jackson apologize to Ms. Fitzgerald for the search. (*Id.* ¶ 20.)

According to the declaration of Defendant Jackson (Doc. No. 41-7), at 11:15 a.m. on September 28, 2019, Defendant Mann-Little requested Jackson's assistance in conducting an unclothed body search of a female visitor "because there was reasonable suspicion to believe that the visitor may be attempting to smuggle drugs or contraband into the prison." (*Id.* at ¶ 2.) Jackson declares that, once inside the room where the search of Ms. Fitzgerald was to take place, she heard Mann-Little inform Ms. Fitzgerald that: (1) she would be asking Ms. Fitzgerald to removal all garments, including her under garments; (2) she would be inspecting Ms. Fitzgerald's body for any contraband; and (3) Ms. Fitzgerald could refuse to consent to the search, and stop the search at any point if she felt

uncomfortable.  (*Id.* ¶ 4.)  Jackson attests that Mann-Little explicitly informed Ms. Fitzgerald at multiple times during the search that she could stop the search at any point, that Ms. Fitzgerald acknowledged that she understood that she could do so, but that at no time did Ms. Fitzgerald withdraw her consent to the search.  (*Id.* ¶ 6.)  Jackson also declares "I never apologized to Ms. Fitzgerald for searching her, but I did acknowledge that the process can be uncomfortable."  (*Id.* at ¶ 7.)

Ms. Fitzgerald's recitation of the search provides a different story.  She declares that Defendant Mann-Little never gave her the option of terminating the search and that she did not understand that was an option.  (Doc. No. 46 ¶ 71.)  Further, she declares that when Mann-Little told her to remove her bra and panties she was "shocked at this request and said, 'I really have to do this?' Mann-Little replied that I had to remove all of my undergarments as well.  During this time, Jackson was blocking the door so that I could not leave."  (*Id.* at ¶¶ 72, 73.)  Ms.  Fitzgerald recounts her understanding of having no other choice but to cooperate with the search and, therefore, she removed her underwear.  (*Id.*  ¶¶ 74, 75.)  Ms. Fitzgerald declares that she was extremely frightened and upset and that Mann-Little asked if she was okay.  (*Id.* at ¶ 79.)

Ms. Fitzgerald attests that she asked Defendant Mann-Little for a copy of the Notice of Request to Search Form but was refused.  (*Id.* ¶ 83.)  After making multiple requests for a copy of the Notice of Request for Search Form, in November 2019, Ms. Fitzgerald secured a copy of the Notice.  (*Id.*  ¶¶ 86 -89, 91, 92.)

Further, Ms. Fitzgerald declares that when she arrived in the inmate-visiting room to see inmate Roberts after the search, she:

> asked Jackson if this was a normal process.  Jackson replied that she was just doing her job and that such searches can be randomly done.  A male corrections office in the inmate visitor room likewise confirmed that the searches can be done randomly.

*Id.* at ¶ 84.  Ms. Fitzgerald declares she "told Jackson that it was a horrible experience. Jackson apologized for what occurred."  (*Id.* at ¶ 85.)

20cv848 JM(NLS)

On a subsequent visit, Ms. Fitzgerald heard from another female visitor that she had heard that Plaintiff was strip searched and that she too had been the subject of a strip search. (*Id.* ¶ 90.) Ms. Fitzgerald declares that this individual told her that strip searching was a common practice at Donovan. (*Id.*)

In her declaration, Ms. Fitzgerald also declares: (i) she has never smuggled any contraband into Donovan (*id.* ¶ 93); (ii) that no one has ever asked her to smuggle anything into Donovan (*id.* at ¶ 95); and (iii) in 2018 and 2019, she "used her PayPal (RFKelley2004@yahoo.com) and Venmo (@RhondaFitzgerald-2) accounts to send money to Roberts' prison account and that the accounts were hacked a couple of years ago and [she] ceased using them," (*id.* at ¶ 6).

Defendants Cruz, Jackson, Mann-Little and Moore, all declare that Defendant Pollard "never instructed [them] to search Ms. Fitzgerald" and Pollard "has never to [their] knowledge, instructed any correctional officer to 'randomly search any visitor to Donovan" nor "instituted or allowed a policy or practice of randomly searching visitors to Donovan." (Doc. No. 41-2 at ¶ 27; Doc. No. 41-7 at ¶ 10; Doc. No. 41-8 at ¶ 22; Doc. No. 41-10 at 30.)

According to the declaration of Defendant Pollard (Doc. No. 41-12), "[t]here is no policy or practice permitting illegal searches of visitors to Donovan, and there is no policy or practice of conducting random unclothed body searches of visitors to Donovan." (*Id.* at ¶ 2.) Pollard declares that he has "never authorized random unclothed body searches of visitors to Donovan because doing so would violate prison regulations and CDCR policies." (*Id.*) Regarding Ms. Fitzgerald, Pollard attests that he "never ordered or requested that [she] be searched," and that until the filing of this lawsuit he "did not have any knowledge of who Rhonda Fitzgerald or inmate Christopher Roberts were." (*Id.* at ¶ 10.)

On May 5, 2020, Ms. Fitzgerald filed this suit in district court, pursuant to 42 U.S.C. § 1983, alleging that Defendants violated her civil rights and committed torts against her. ("Compl.") In the Complaint, Plaintiff asserts: (1) a claim for violation of her Fourth

Amendment right – search without reasonable suspicion against all Defendants; (2) a claim for violation of her Fourth Amendment right – search without reasonable suspicion against Defendant Pollard and Doe 1; and (3) a claim for violation of the Fourth Amendment – failure to train and supervise against Defendant Pollard and Doe 1. (Compl. at 8-16[6].) Ms. Fitzgerald also brings state law claims for intentional infliction of emotional distress and negligence, against all Defendants. (*Id.* at 16-19.)

Ms. Fitzgerald seeks to represent a Class consisting of:

> those visitors to the Richard J. Donovan Correctional Facility in the Class Period[7] who were required to submit to an unclothed search as a condition to visiting an inmate and whose Notice of Request for Search Form states no specific objective facts and rational inferences establishing individualized reasonable suspicion to believe that the person targeted for the search had an intention of smuggling contraband into the Prison.

*Id.* ¶ 38. Ms. Fitzgerald seeks injunctive relief barring Defendants from performing further random unclothed searches of visitors at the prison, money damages, and attorney's fees and costs. (*Id.* at 20-21.)

On June 1, 2021, Defendants filed an early Motion for Summary Judgment (Doc. No. 41) shortly after their request to bifurcate discovery was granted in part. (*See* Doc. Nos. 33, 37, 39.) On June 28, 2021, Ms. Fitzgerald filed her Response in Opposition (Doc. No. 45), and, after being awarded a brief extension (Doc. Nos. 47, 48), Defendants duly filed their Reply (Doc. No. 49).

## II.   EVIDENTIARY OBJECTIONS

Before addressing the merits of the motion, the court will first address Ms.

---

[6] Document numbers and page references are to those assigned by CM/ECF for the docket entry.

[7] The Complaint defines the Class Period as running "from two years prior to the filing date of this action to the present date." Compl. ¶ 37.

20cv848 JM(NLS)

Fitzgerald's evidentiary objections.

Ms. Fitzgerald filed 30 objections, spanning 54 pages, related to the declaration of Defendant Moore, objecting to numerous paragraphs on various grounds including lack of foundation, hearsay, inadmissible content, argumentative, and legal conclusion. (Doc. No. 45-3.)  Additionally, she filed 29 objections, spanning 52 pages, related to the declaration of Defendant Cruz objecting to numerous paragraphs on the same grounds.  (Doc. No. 45- 6.)  Further, Ms. Fitzgerald filed 11 objections, spanning 23 pages, related to the confidential memo of Officer Fredrick raising similar objections and including lack of personal knowledge. (Doc. No. 45-5.)  Finally, Ms. Fitzgerald filed an objection, spanning 6 pages, to the declaration of Defendant Mann-Little on the grounds that paragraph 8 lacks foundation, is hearsay, and contains inadmissible content.  (Doc. No. 45-8.)  In their Reply brief, Defendants counter that the objections are fundamentally flawed, and the documents satisfy foundational evidentiary requirements under multiple basis, including the "state-of-mind" exception to hearsay, set forth in Federal Rule of Evidence 801(c).  (Doc. No. 49 at 2-3.)

Few, if any, of these objections are useful to the court's analysis of the motions. *Cf. Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (noting that "attorneys routinely raise every objection imaginable without regard to whether the objections are necessary or even useful, given the nature of summary judgment motions in general, and the facts of their cases in particular."); *Doe v. Starbucks*, No. SACV 09-0582 AG (CWx), 2009 WL 5183773, at *1 (C.D. Cal., Dec. 18, 2009) (recognizing that when parties make numerous objections in motions for summary judgment "it is often unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised.  This is especially true when many of the objections are boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence.").  But "[i]nstead of *objecting*, parties should simply *argue* that the facts are not material.  Objecting to statements in declarations based on improper legal conclusions, or argumentative statements, are not facts and likewise will

not be considered on a motion for summary judgment.  Objections on any of these grounds are simply superfluous in this context." *Burch*, 433 F. Supp. 2d at 1119.  "[I]nstead of challenging the admissibility of the evidence, lawyers should challenge its sufficiency." *Id.*

Ms. Fitzgerald asserts Defendants Moore, Cruz, Mann-Little and Fredrick lack personal knowledge to make various statements regarding their conversations with other officers and the contents of prison records, as set forth in their declarations. (Doc. Nos. 45-3, 45-5. 45-6, 45-7, 45-8.)   These objections are unpersuasive. These Defendants have personal knowledge of their own conversations with coworkers and their own review of an inmate's files. *See Wash. Cent. R.R. Co. v. Nat'l Mediation Bd.*, 830 F. Supp. 1343, 1353 (E.D. Wash. 1993) ("[P]ersonal knowledge can come from review of the contents of files and records."); *see also* Fed. R. Evid. 901(b) (a document can be authenticated by a witness who "wrote it, signed it, used it, or saw others do so.").  Indeed, Defendants' statements go directly to whether they had reasonable suspicion to perform a search of Ms. Fitzgerald, which forms the central dispute of this case**.**

Ms. Fitzgerald's objections on the basis of "hearsay" are unpersuasive for the same reasons.  *See JL Bev. Co., LLC. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) (a district court may consider hearsay evidence submitted in an inadmissable form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony).  Ms. Fitzgerald should be emphasizing, instead, that the court should give little or no weight to Defendants' evidentiary submission.  Ms. Fitzgerald's objections are, therefore, **overruled**.

## III.   LEGAL STANDARD

A motion for summary judgment shall be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).    But Federal Rule of Civil Procedure 56 contains "no express or implied requirement . . . that the moving party support its motion with affidavits or other similar materials <u>negating</u> the opponent's claim." *Id.* (emphasis in original).

In response to a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials of a pleading, but must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).    In other words, the nonmoving party may not rely solely on conclusory allegations unsupported by factual data.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  The court must examine the evidence in the light most favorable to the nonmoving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), and any doubt as to the existence of an issue of material fact requires denial of the motion, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## IV.    DISCUSSION

All Defendants move for summary judgment on Plaintiff's 42 U.S.C. § 1983 claims. (Doc. No. 41.)  Defendant Pollard moves for summary judgment on the failure to train and supervise claim.    Additionally, all Defendants argue that the pendant state law claims should be dismissed.  Finally, Defendants contend that the class action claim should be dismissed because, without a claim, Fitzgerald cannot adequately represent the putative class.  Plaintiff opposes.  (Doc. No. 45.)

### 1. Fourth Amendment Unreasonable Search Claims

Defendants move for summary judgment on Ms. Fitzgerald's Fourth Amendment unreasonable search claims contending: (1) reasonable suspicion supported the search and it was not random; and (2) Ms. Fitzgerald voluntarily consented to the unclothed search of her person.  Ms. Fitzgerald maintains: (1) she did not voluntarily consent to be strip searched; and (2) that triable issues of fact exist regarding whether the search was reasonable and/or random.

In *Cates v. Stroud,* 976 F.3d 972, 980 (9th Cir. 2020), the Ninth Circuit reaffirmed that strip searches of prison visitors are permissible "when based on reasonable and individualized suspicion." Further, the Court of Appeals explained that "even where there is reasonable suspicion that a prison visitor is carrying contraband, a strip search is permissible only if it can be justified by a legitimate security concern." *Id*.

"A reasonable suspicion exists when the person responsible for the search is aware of specific articulable facts, and inferences from those facts, which reasonably warrant a suspicion that evidence will be uncovered." *Kirkpatrick v. City of L.A.*, 803 F.2d 485, 490 (9th Cir. 1986). It requires looking to "the totality of the circumstances-the whole picture." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "Reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 110 S. Ct. 2412, 2415 (1990). Courts have consistently acknowledged that this standard requires that the prison officials have "reasonable grounds, based on objective facts, to believe that a particular visitor will attempt to smuggle contraband by secreting and carrying it on his person." *Hunter v. Auger*, 672 F.2d 668, 675 (8th Cir. 1982).

There is no question that preventing contraband, including illegal drugs, constitutes a legitimate security concern for prison officials. The issue posed in Defendants' motion is whether reasonable suspicion supported the strip search.

Defendants rely heavily on the information contained in the confidential memos found in inmate Roberts' files, along with the Rule Violation Reports, as providing the necessary justification for strip searching Ms. Fitzgerald on September 28, 2019. (Doc. No. 41 at 13, 14, 21-23.) They contend this evidence gave Defendants Moore and Cruz overwhelming and particularized suspicion to suspect Ms. Fitzgerald was smuggling drugs into Donovan, and that there was nothing random about the search of Fitzgerald. It is their position that "based on the totality of the circumstances" there was reasonable suspicion to search Fitzgerald and that they would have been "delinquent" had they not done so because of the importance of maintaining institutional security and preventing contraband from being introduced into the prison. (*Id*. at 23.) At the hearing, defense counsel argued that

15

Defendants would have been remiss in their obligations if they had not searched Ms. Fitzgerald after Defendant Moore discovered the information in inmate Roberts' file.

In opposition, Ms. Fitzgerald has made numerous arguments that call into question the "individualized" component of the suspicion articulated by Defendants Moore and Cruz. (Doc. No. 45 at 9, 10, 16-17.) First, she highlights that in July 2018, Confidential Informant # 4 never mentioned Ms. Fitzgerald when he allegedly told Sergeant Hernandez that Roberts was trafficking contraband received from visitors because Ms. Fitzgerald did not ever visit Donovan until well over a year after the report of Confidential Informant #4. Second, she calls attention to the fact that Confidential Informant #3 allegedly told Sergeant Eustaquio on November 1, 2018, that Roberts was getting drugs from his *wife's* weekly visits, and also argues that she was not mentioned by Confidential Informant #3 as she had never visited Donovan at that point in time. Third, Ms. Fitzgerald focuses on the May 1, 2019 memo written by Officer Fredrick, noting that in January 2019, Confidential Informant #1 allegedly told Officer Fredrick that Roberts received contraband through regular family visits. Ms. Fitzgerald points out the ambiguity in the attached handwritten Kite which states: "Roberts went to visit on Sunday with Rhonda Fitzgerald and picked up an ounce of heroin for him and Daniels." As Ms. Fitzgerald explains, Confidential Informant #1 "could not have meant that Roberts picked up the drugs from Plaintiff because Plaintiff had never visited Donovan as of May 1, 2019." (Doc. No. 45 at 9.) Fourth, Ms. Fitzgerald emphasizes that although inmate Roberts has been found with two cell phones, his prison file does not show any evidence that he has ever been caught with drugs. She therefore argues that Defendants could have used a metal detector or hand-held wand to search for the only type of contraband Roberts has ever been found to possess, cell phones. Fifth, Ms. Fitzgerald stresses that she visited inmate Roberts 38 times, without incident, before she was strip searched on September 28, 2019. Finally, Ms. Fitzgerald claims that her Venmo and PayPal accounts were both hacked and that the "Venmo and PayPal account numbers listed on Defendants' exhibit are not [her] current account numbers and haven't been in use for over 1 ½ years." Ms. Fitzgerald's points call into

16

question whether the tips from the confidential prison informants and the information concerning the two cell phones provided the individualized suspicion necessary to make the search of Ms. Fitzgerald reasonable.

There is also no indication that either Defendant Moore or Defendant Cruz performed any independent inquiry to confirm Ms. Fitzgerald's alleged role in inmate Roberts' purported drug enterprise after reading memos that were respectively written 14 months, 10 1/2 months, 4 1/2 months and over 3 months before the search of Ms. Fitzgerald. *Daugherty v. Campbell*, 33 F.3d 554, 556 (6th Cir. 1994) (prison guards' general suspicion of smuggling activity does not justify a strip search, "reasonable suspicion exists only if the information contained in the tip is linked to other objective facts known by correctional authorities."); *Hunter*, 672 F.2d at 675 (8th Cir. 1982) (prison officials "must have reasonable grounds, based on objective facts, to believe that a particular visitor will attempt to smuggle contraband . . . generalized suspicion of smuggling activity is insufficient to justify the extensive intrusion of a strip search."); *Hernandez v. Montanez*, 36 F. Supp. 3d 202, 214 (D. Mass. 2014) (finding an inmate's reputation for being involved in drug activity was insufficient to corroborate an anonymous tip, absent independent suspicion that prison visitor had been the one supplying the inmate with the drugs. The anonymous tip was the only information linking the prison visitor to drug activity; therefore, it could not supply the reasonable suspicion necessary to conduct a lawful strip-search of the prison visitor.) Nor is there any evidence in the record that prison personnel ever searched inmate Roberts or his cell for illicit drugs during the relevant times the confidential statements were being made (aside from the cell phone discoveries).

The court would also be remiss if it did not mention the current posture of this case. All of the officers have submitted declarations which utilize in large measure boilerplate language and present remarkably similar accounts of what happened, while Ms. Fitzgerald has not yet been given the opportunity to depose these individuals, the confidential informants, or gather much evidence to dispute their recitation of events. Discovery has

been on hold and is still open.  At bottom, the court is left with the parties' competing declarations that set out very different versions of the circumstances surrounding the strip search and subsequent visual body cavity search of Ms. Fitzgerald, making summary judgment inappropriate.  *See, e.g.*, *Kong v. Lopez*, No. CV 18-2538-MWF (GJSx), 2019 WL 1751826, at *5 (C.D. Cal. Feb. 15, 2019). ("On a motion for summary judgment, the Court can neither determine the credibility of the competing declarations nor place weight on the competing evidence presented . . . . The dispute is therefore more appropriately left to the jury rather than determined by the Court on summary judgment.") (internal citations omitted); *Gray v. Virga*, No. 12-CV-3006-KJM, 2017 WL 117895, at *9 (E.D. Cal. Jan. 12, 2017) ("The disputes caused by the competing declarations cannot be resolved without credibility determinations, which are the function of the jury, not of a judge on a motion for summary judgment."); *Banks v. Hayward*, 216 F.3d 1082, 1082 (9th Cir. 2000) ("[I]n evaluating a motion for summary judgment, the court may not make credibility determinations or weigh conflicting evidence.").  *See also Furie v. Infowars, LLC*, 401 F. Supp. 3d 952, 967 (C.D. Cal. 2019) (dispute is "more appropriately left to the jury rather than determined by the Court on summary judgment" where both parties have simply presented conflicting statements).

In light of the above, the court cannot conclude as a matter of law that there was reasonable and individualized suspicion to search Ms. Fitzgerald.  For the same reasons, the court is unable to conclude, as Defendants suggest, that Ms. Fitzgerald was not randomly selected for an "unclothed" search.  (*Compare* Doc. No. 41-8 at ¶ 5 *with* Doc. No. 46 at ¶¶ 53-58, 84.[8]).  The conflicting accounts surrounding the question of whether

---

[8] Defendant Mann-Little declares that she informed Ms. Fitzgerald that "prison staff suspected that she may be attempting to introduce contraband into the facility, and that [her] supervisors were requiring [the] search," (Doc. No. 41-8 at ¶ 5), Ms. Fitzgerald reports the opposite.  She attests that when Mann-Little asked her to consent to an unclothed search, the following interaction occurred:

I responded, "A search for what?

the search was random, provide further support for this issue being ill-suited for summary judgment.  Consequently, Defendants' motion to grant summary judgment on the Fourth Amendment unreasonable search claims is **denied.**

### 2.  Voluntariness of Search

Defendants also argue that because Ms. Fitzgerald consented to the unclothed body search, they did not violate her Fourth Amendment right to be free from an unreasonable search.  (Doc. No. 41 at 24-27.)  Further, they contend that she did not object to the scope of the search when it extended beyond her outer garments.

Ordinarily, a search conducted pursuant to a valid consent is constitutionally permissible.  *United States v. Mendenhall*, 446 U.S. 544, 557-8 (1980).  Whether consent has been freely given is based on an examination of the totality of the circumstances.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973) ("In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents."); *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 437 (9th Cir. 2010).  The voluntariness of a consent to a search is a question of fact to be determined from the totality of the circumstances.  *United States v. Patayan*, 361 F.3d 494, 501 (9th

---

Mann Little responded, 'It is just a random search"
I responded, "Why me?"
Mann-Little responded, "The warden can request them at any time."
I responded, "Why is the warden requesting a search? He does not even know me."
Mann-Little responded, "It can be a random search.

Doc. No. 46 at ¶¶ 53-58.  In her declaration, Ms.  Fitzgerald recounts an interaction with Defendant Jackson in the inmate visiting room following the search where she "asked Jackson if this was a normal process.  Jackson replied that she was just doing her job and that such searches can be randomly." (*Id.* at ¶ 84.) Jackson's declaration makes no mention of the inmate visiting room interaction.  Further, Ms. Fitzgerald declares that an unidentified male prison guard in the visiting room also "confirmed that the searches are done randomly." (*Id.*)

Cir. 2004).   The Ninth Circuit has recognized that "each factual situation surrounding consent is unique," and a court "may take into account any other factors that [it] deem[s] relevant."   *Liberal v. Estrada,* 632 F.3d 1064, 1082 (9th Cir. 2011).

The parties set forth differing meanings of "unclothed search" in their papers.  (Doc. No. 41 at 26-27.)  Ms. Fitzgerald maintains that she assumed an "unclothed search" would require removing her top and pants and being patted down to search for guns and contraband. (Doc. No. 46 at ¶ 59.) Defendants invite this court to discount Ms. Fitzgerald's interpretation of "unclothed," even though defense counsel commendably acknowledged during oral argument that there essentially existed no practical distinction between a strip search and the "unclothed search" in this case.   While the court does not wish to get ensnared in semantics at this juncture, the court notes that Defendant Mann-Little describes how she instructed Ms. Fitzgerald to:

> remove one article of clothing at a time and hand it to me.  I then inspected each article of clothing as Ms. Fitzgerald handed it to me.   The search proceeded in this manner until Ms. Fitzgerald had removed all her clothing.  I then inspected Ms. Fitzgerald's body for contraband.  I saw none.  I also inspected Ms. Fitzgerald's body cavities by asking her to bend over so that I could conduct a visual inspection.

Doc. No. 41-8 at ¶ 17.  This description buttresses Ms. Fitzgerald's argument that she was subject to more than an unclothed search, to wit a strip search with cavity inspection. Defendants would also have this court discount Ms. Fitzgerald's interpretation, despite knowing what the search would entail, all the while providing Ms. Fitzgerald with a form that contained little to no information regarding the dehumanizing, humiliating and intrusiveness nature of the search to which she was "requested" to consent.[9]   *See Cates,*

---

[9] The Notice of Request for Search Form contains the following language: "Consistent with the posted Notice at the entrance of the facility, we request you voluntary submission [sic] to an unclothed search of your person and Any [sic] minors accompanying you."  (Doc. No. 41-9 at 3.)

976 F.3d at 979-80 (noting that strip searches involving visual body-cavity searches "are dehumanizing and humiliating," the intrusiveness of which "cannot be overstated.")  The court declines to do so.

The parties also dispute practically every salient fact surrounding whether Ms. Fitzgerald consented to the "unclothed" and "visual body cavity search" portions of the search.  Given the nascent state of discovery, there is very little information before the court.  Ms. Fitzgerald does not dispute that she signed the Notice of Request to Search Form, (Doc. No. 46 at ¶ 65), but maintains she knowingly consented only to a search with outer garments removed, not to a strip search with a visual inspection of her body cavity(ies).  (*Id*. at ¶¶ 59, 62).  Ms. Fitzgerald disputes that she was free to stop the search at any time.  (*Id*. at ¶¶ 71-73.)  Further, Ms. Fitzgerald continues in her belief that had she not consented to the search, she would have not been allowed to visit Roberts.  (*Id*. ¶¶ 52, 61.)

Thus, when one focuses on the relevant circumstances, disagreement abounds on nearly every material fact surrounding Fitzgerald's consent with the parties relying on their respective contributions to the evidentiary record.  The circumstances as propounded by Ms. Fitzgerald would vitiate her consent.  Consequently, Defendants have fallen leagues short of their burden of establishing that no genuine issue of material fact remains regarding consent and, therefore, they are not entitled to summary judgment on this question.  *Crowe*, 608 F.3d at 437.

### 3. Claims Against Defendant Pollard

Defendant Pollard contends that he is entitled to summary judgment on Ms. Fitzgerald's failure to train and Fourth Amendment claims.

#### a. *Failure to Train Claim*

Defendant Pollard has moved for summary judgment on the failure to train claim brought against him.  (Doc. No. 41 at 28.)

To successfully make her claim against Pollard, in his individual capacity, Ms. Fitzgerald must demonstrate he "was deliberately indifferent to the need to train

subordinates, and the lack of training actually caused the constitutional harm or deprivation of rights." *Flores v. Cnty. of L.A.* 758 F.3d 1154, 1159 (9th Cir. 2014) (quoting *Connick v. Thompson,* 131 S. Ct. 1350, 1358 (2011)).  This means Ms. Fitzgerald must eventually show Pollard "disregarded the known or obvious consequences that a particular omission in the training program would cause employees to violate citizens' constitutional rights." *Id.* (citation omitted). A "pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 131 S. Ct. at 1358.

Here, it is undisputed by the parties that all Donovan staff are expected to adhere to California Department of Corrections and Rehabilitation's ("CDCR") training requirements.  (Doc. No. 45-1 at ¶ 63.)  It is also undisputed that all Donovan staff undergo 48 hours of in-service training and 12 hours of on-the-job training every year.  (*Id.* at ¶ 64.) And, the parties do not dispute that this training of custody staff, includes how, when, and under what circumstances unclothed body searches of visitors may be conducted.  (*Id.* at ¶ 65.)  Further, the parties agree that this training includes instruction that consent, and reasonable suspicion are required before an unclothed body search can be conducted.  (*Id.* at ¶ 66.)

In opposition, Plaintiff focuses on her recounting of Defendant Mann-Little's behavior and claims "a comedy of errors establishes a genuine dispute as to whether the Donovan corrections staff were woefully unprepared and whether such lack of training caused the deprivation of Plaintiff's Fourth Amendment rights." (Doc. No. 45 at 31.)  After detailing the interaction between Ms. Fitzgerald and Mann-Little, the opposition brief concludes "[s]ince the need for additional training is obvious, Warden Pollard's deliberate indifference can be inferred." (*Id.* at 32.)

Plaintiff's admission of these undisputed facts, and her failure to identify what specifically was deficient in the training offered by Defendant Pollard, or that even he was personally responsible for any such training, weighs in favor of granting the motion for summary judgment on this claim.  However, because no depositions have been taken, if

the disputed statements Ms. Fitzgerald attributes to staff, (*see* Doc. No. 46 at ¶¶ 58, 84, "it can be a random search" "searches can be randomly," "searches are done randomly") are true, they point to a practice which could be problematic.   Consequently, Defendant Pollard's motion to grant summary judgment on the failure to train claim is **denied** at this time, **without prejudice** to the issue being addressed in later motion practice.

### b. *Fourth Amendment Claim*

Defendant Pollard moves to have the Fourth Amendment claim against him dismissed because he was not personally involved in the search of Ms. Fitzgerald.  (Doc. No. 41 at 28-29.) Additionally, he argues that he cannot be held vicariously liable for Fitzgerald's search.  (*Id.* at 29-20.)

A state official is not vicariously liable for the deprivation of constitutional rights by employees.  *Monell v. N.Y.C. Dep't of Soc. Servs.,* 436 U.S. 2018, 694 (1978).  Such officials are only subject to suit if "they play an affirmative part in the alleged deprivation of constitutional rights."  *King v. Atiyeh,* 814 F.2d 565, 568 (9th Cir. 1987).  "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

Defendant Pollard argues that he was in no way involved in the search of Ms. Fitzgerald and that there is no causal connection between action on his part and the search itself.  (Doc. No. 41 at 29.)  All of the Defendants, including Pollard, have submitted declarations that attest he had nothing to do with Ms. Fitzgerald's search, (*see* Doc. No. 41-2 at ¶ 27; Doc. No. 41-7 at ¶ 10; Doc. No. 41-8 at ¶ 22; Doc. No. 41-10 at ¶ 30; Doc. No. 41-12 at ¶ 10).  In contrast, Ms. Fitzgerald has submitted a declaration asserting the opposite.  (Doc. No. 46 at ¶¶ 53-58.)  Facing competing declarations once more, the court concludes it would be inappropriate to decide this issue on summary judgment because to do so would require determining the credibility of the competing declarations and weighing the question of any personal involvement by Pollard in an evidentiary vacuum.

Consequently, Defendant Pollard's motion for summary judgment on the Fourth Amendment claim brought against him, individually, is **denied** at this time, **without prejudice** to the issue being addressed in later motion practice.

### 4. Qualified Immunity

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Lane,* 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). In determining the applicability of the qualified immunity doctrine, the court conducts a two-part test to decide: (1) if the alleged facts show a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of defendant's alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier,* 533 U.S. at 201. "The qualified immunity analysis thus is limited to 'the facts that were knowable to the defendant officers' at the time they engaged in the conduct in question." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (quoting *White v. Pauly,* 137 S. Ct. 548, 550 (2017) (*per curiam*)). "Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant." *Id*. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

Defendants argue that they are entitled to qualified immunity for Ms. Fitzgerald's Fourth Amendment claims under either step of the analysis. Defendants assert there was no Fourth Amendment violation and that the law governing Fitzgerald's search was not settled as of September 28, 2019. (Doc. No. 41 at 30-33.)

### a. Constitutional Violation

Defendants argue that the search of Ms. Fitzgerald was supported by the reliable information provided by the confidential informants, which established an individualized and reasonable suspicion that Fitzgerald could be assisting inmate Roberts in trafficking

24

20cv848 JM(NLS)

narcotics in the prison. (Doc. No. 41 at 31.) They contend that any officer in Defendants' position would believe that there was reasonable suspicion to search Fitzgerald.

The Fourth Amendment prohibits unreasonable searches and seizures. *Bell v. Wolfish,* 441 U.S. 520, 558 (1979). Neither party disputes that a strip search of a prison visitor without reasonable suspicion would be a violation of the Fourth Amendment.[10] *See Cates,* 976 F.3d at 980 (affirming strip searches of prison visitors are permissible "when based on reasonable and individualized suspicion.") Reasonable suspicion must be based on "specific articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Lopez-Soto,* 205 F.3d 1101, 1105 (9th Cir. 2000) (citing *United States v. Michael R.,* 90 F.3d 340, 346 (9th Cir. 1996) (quoting *United States v. Garcia-Camacho,* 53 F.3d 244, 246 (9th Cir. 1995))).

As set forth above, several material facts are disputed which call into question whether the search of Ms. Fitzgerald was based on reasonable and particularized suspicion or whether it was ordered without the requisite level of suspicion. The memos relied on by Defendants Moore and Cruz document conversations with confidential informants that occurred over three months to upwards of a year before the search of Ms. Fitzgerald took place. And three of the memos were written before Ms. Fitzgerald had even made her first visit to Donovan. Furthermore, while Confidential Informant #1 is the only person who expressly identifies Ms. Fitzgerald and provides her PayPal and Venmo account details, there is an ambiguity in the information he provides and the date on his handwritten Kite appears to have been altered. In addition, there is currently no evidence of sufficient substantiality before the court, that any contraband, other than cellphones, has ever been linked to inmate Roberts. There is also no indication that any of the Defendants performed

---

[10] This unassailable proposition was also acknowledged by defense counsel in oral argument.

20cv848 JM(NLS)

any independent inquiry to link Ms. Fitzgerald to their generalized suspicion of inmate Roberts' drug activity.

Viewing these facts in the light most favorable to Ms. Fitzgerald, a jury could reasonably find that Defendants lacked a reasonable and particularized suspicion to justify a strip search and visual examination of Ms. Fitzgerald's body cavities.   Thus, the court cannot conclude there was no violation Ms. Fitzgerald's Fourth Amendment right.

### b. *Clearly Established Right*

In its order on Defendants' earlier motion to dismiss, this court applied the "clearly established right" standard in denying Defendants' motion *(see* Doc. No. 20 at 11-13).  But, for the sake of completeness, the analysis is reiterated here.   An individual's clearly established rights are only violated by a defendant when "'the state of the law' at the time of an incident provided 'fair warning' to the defendant that his or her conduct was unconstitutional." *Tolan v. Cotton,* 572 U.S. 650, 656, (2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).   In other words, "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks and citation omitted). *See also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").   The Supreme Court has stated that "the clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).   Ordinarily, a court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

A court "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." *Jessop v. City of Fresno*, 936 F.3d 937, 941 (9th Cir 2019) (quoting *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005)).  *See also D.C. v. Wesby*, 138 S. Ct. 577, 589-90, (2018) (stating that we must look first to binding precedent, then we may consider a "robust consensus of cases of persuasive authority").

20cv848 JM(NLS)

But "while unpublished decisions of district courts may inform our qualified immunity analysis ... it will be a rare instance in which, absent any published opinions on point or overwhelming obviousness of illegality, we can conclude that the law was clearly established on the basis of unpublished decisions only.'" *Rico v. Ducart*, 980 F.3d 1292, 1300-01 (9th Cir. 2020) (quoting *Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002)); *see also* 9th Cir. R. 36-3(a) (unpublished dispositions are not precedential).

Notwithstanding these guidelines, "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590. Thus, "[w]hen a violation is obvious enough to override the necessity of a specific factual analogue, ... it is almost always wrong for an officer in those circumstances to act as he did." *Sharp v. Cnty. of Orange*, 871 F.3d 901, 912 (9th Cir. 2017).

"Training materials and regulations are also relevant, although not dispositive, to determining whether reasonable officers would have been on notice that their conduct was unreasonable." *Vazquez v. Cnty. of Kern*, 949 F.3d 1153, 1165 (9th Cir. 2020) (citing *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003); *see also Hope v. Pelzer*, 536 U.S. 730 (2002) (considering an Alabama Department of Corrections regulation and a Department of Justice report in its qualified immunity analysis).

In the earlier order, this court delved into the legal history surrounding the Fourth Amendment protections prison visitors have, and should be, afforded and will not recount it here. (*See* Doc. No. 20 at 13-21.) Suffice to say, the court finds no reason to depart from its earlier observation that, absent an unusual need, the Constitution requires a particularized level of suspicion in order to perform a valid strip search of a prison visitor. Indeed, this:

> 'basic constitutional norm' is so obvious that the case law in this area focuses on the constitutional protections afforded detainees and prison visitors who have been *suspected* of carrying contraband – namely the reasonable suspicion standard. In other words, if reasonable suspicion is required to

search someone suspected of carrying contraband, the obvious illegality of conducting a random visual body-cavity strip search of a prison visitor absent reasonable suspicion violates the most fundamental principles of personal privacy and dignity for which the Fourth Amendment stands.

(*Id*. at 14.)  This court reached this conclusion without relying on the language of *Cates* that "[e]xisting case law has already established that a strip search of a prison visitor conducted without reasonable suspicion is unconstitutional," because: (i) of the possibility the language could be interpreted as dicta; and (ii) it would be inappropriate to view *Cates* as controlling authority since the opinion was issued by the Ninth Circuit one year after the alleged conduct in this case.  *Cates*, 976 F.3d at 985.

This court also comprehensively detailed authorities from sister circuits as of the date of the alleged incident, (*see id*. at 14-20), to support the proposition that a strip search of a prison visitor not based on reasonable suspicion was already established as unconstitutional and beyond debate.  *See al-Kidd*, 563 U.S. at 741 ("existing precedent must have placed the … question beyond debate.").  For example, it noted that in *Blackburn v. Snow*, 771 F.2d 556, 562 (1st Cir. 1985) the First Circuit concluded that "a rule requiring *all* prison visitors to submit to a body cavity strip search, without *any* predicate requirement of individualized suspicion or showing of special and highly unusual institutional need, cannot satisfy the Fourth Amendment."  *Blackburn*, 771 F.2d. at 562.[11]  This court also found support for this position in the Eighth Circuit's holding in *Hunter v. Auger*, 772 F.2d 688, 675 (8th Cir. 1982) (finding that a strip search of a prison visitor is unreasonable under the Fourth Amendment in "the absence of reasonable, articulable grounds to suspect a particular visitor of an attempt to smuggle drugs or other contraband by secreting them on

_____

[11] The *Blackburn* court also held that "the Sheriff was not free to condition the visitation opportunity on the sacrifice of Blackburn's protected Fourth Amendment rights.  Nor is it any answer to say that Blackburn could have left at any time, or declined to return after the first strip search, for it is the very choice to which she was put that is constitutionally intolerable."  *Blackburn,* 771 F.2d at 568.

his person.") and *Thorne v. Jones*, 765 F.2d 1270, 1276-77(5th Cir. 1985) (finding at-will random searches not reasonable under the Fourth Amendment and noting that "'reasonable suspicion' must be specifically directed to the [prison visitor] to be searched…. [T]he fourth amendment does not permit any automatic or casual transference of 'suspicion.'").

Further, this court found additional cases from the First, Second, and Sixth Circuits, along with an earlier Eighth Circuit case, which revealed holdings requiring reasonable and particularized suspicion before a prison visitor may be constitutionally strip searched.  *See, e.g., Wood v. Clemons,* 89 F.3d 922, 929 (1st Cir. 1996) (explicitly stating "'reasonable suspicion' is indeed the proper standard by which to gauge the constitutionality of prison-visitor strip searches. That standard guards against arbitrary or clearly unfounded searches by placing non-trivial constraints upon the ability of prison officials to strip search visitors."); *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997) ("correctional officers needed reasonable suspicion to strip search prison visitors  without violating their constitutional rights"); *Spear v. Sowders*, 71 F.3d 626, 632 (6th Cir. 1995) (holding that a strip and body cavity search of a prison visitor "may be conducted only when there is reasonable suspicion [and] also demands that the person to be subjected to such an invasive search be given the opportunity to depart"); *Smothers v. Gibson*, 778 F.2d 470, 473 (8th Cir. 1980) ("While prison officials have the right to conduct reasonable searches of prison visitors, with far greater latitude than in other settings, the right to indiscriminately strip search anyone who enters is not and cannot be authorized.").  Thus, this court stands by its earlier determination that, taken together: "these cases provide 'a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'  *Wilson*, 526 U.S. at 616."  (Doc. No. 20 at 20.)

Furthermore, as this court previously noted, California's own state regulations governing prison visitors support the conclusion that the Fourth Amendment right asserted by Plaintiff was delineated clearly at the time of the September 2019 search.  *See Vazquez*, 949 F.3d at 1165 ("Training materials and regulations are relevant …to determining whether reasonable officers would have been on notice that their conduct was reasonable.)

Title 15, section 3173.2 provides that inspection of a visitor's person, personal property and vehicle(s) may occur when there is reasonable suspicion to believe the visitor is attempting to introduce or remove contraband or unauthorized items or substances into or out of the institution/facility.  CAL CODE REGS. tit. 15, § 3172.2.   Further, section 3173.2(d)(7) defines an unclothed body search as:

> a security procedure that involves visual inspection of a person's body with all of their clothing removed and a thorough inspection of the person's clothing for purposes of detecting contraband.  This procedure may be conducted with the visitor's consent when there is a reasonable suspicion that the visitor is carrying contraband and when no less intrusive means are available to conduct the search.

CAL CODE REGS. tit. 15, § 3173.2(d)(7).

Nothing currently before this court has convinced it to switch course.  Rather, it stands firm in its belief that at the time Defendants Pollard, Moore, Cruz, Jackson and Mann-Little allegedly acted, "any reasonable officer" in their position would have known that visual body-cavity strip searches of prison visitors are permissible only when based on reasonable and individualized suspicion.  In other words, such searches, when performed without reasonable and particularized suspicion, or randomly, or on the basis of a "hunch" are unconstitutional.  *See City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 611 (2015) ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it …").

### c. Conclusion Regarding Qualified Immunity

In light of the above, this court cannot conclude that Defendants are entitled to qualified immunity at this time and **denies** the motion for summary judgment on this ground.

///

///

///

30

20cv848 JM(NLS)

**IV. CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment (Doc. No. 41) is **DENIED**.

IT IS SO ORDERED.

Dated:  September 15, 2021

Hon. Jeffrey T. Miller
United States District Judge

31

20cv848 JM(NLS)